No. 19-1497. We'll begin, is it Mr. Falconer? Yes, Your Honor. Good morning to you and you may begin when you're ready. Thank you, Your Honor. May it please the Court. If I could, I'd like to reserve five minutes of my time for rebuttal. There are a handful of factors that this Court has repeatedly said weigh heavily in favor of recruiting appointed counsel. They don't per se require it, but they favor it very strongly. Do the claims involve complicated medical issues? Do the claims require proof of a defendant's state of mind, like deliberate indifference? Is the case past the pleading stage and into summary judgment where you start to need things like testimonial discovery? Is it harder for the plaintiff to gather evidence because of a transfer to a different prison facility or confinement in a segregation unit? Is the plaintiff mentally ill? Those are the boxes, and Mr. Perry's claims check all of them, but the District Court didn't look at any of them. What discovery did Perry want that he could not get? There are, I think, at least two main types, Your Honor. One is deposition discovery, both from the defendants and from some non-party witnesses. Mr. Perry submitted a request for assistance issuing some subpoenas. Seemingly not aware that he could notice the depositions of party defendants without a subpoena. And he had requested some witnesses from Wabash Valley, the facility where he was confined. And I think with the assistance of counsel, I think counsel would probably pursue depositions from some other folks, namely the medical personnel at Newcastle, the facility where he was transferred to, who treated his condition very differently. I have a few quick fact questions, and I'd like to clear them up, please. How many doses of Haldol did Perry receive before and after he executed a consent to treatment? Mr. Perry disputes that he consented to treatment with Haldol, Your Honor. That is in his summary judgment filing below that he says that the Haldol, it's in the record, it's written above the other medications which are written on the line in the form. And Mr. Perry says that when he signed the form, Haldol was not on the form. So he says he did not consent at any time to being treated with Haldol. I do not have, I apologize, I don't have the exact numbers, Your Honor. I can look those up and submit a supplement after the argument if that would be helpful, but I don't want to speculate and get a wrong number. Do you know how often he received Haldol injections? It was roughly every few weeks. There were periodic treatments beginning in August, I think, of 2016 and continuing through February of 2017. And is he currently on Haldol voluntarily or involuntarily? That is, it's not in the record, Your Honor, but to the best of my knowledge, he is not. I believe he may have taken some other anti-psychotic, anti-paranoia medications, including the Geodone that he had taken a little bit at Wabash Valley. But to the best of my knowledge, he is not currently taking Haldol and has not for a few years. So there was an alternative injectionable anti-psychotic other than Haldol? There was certainly an alternative anti-psychotic in the Geodone medication that he had taken before and I believe has taken since. I don't know if it's injectable or if it's strictly administered orally. Did those work? I apologize, Your Honor, could you repeat that? I didn't quite hear it. Those other injections, did that help him? Yes, Your Honor, they did very much. And that's, I think, one of the points about the evidentiary record that experienced counsel could have drawn out much more effectively than Mr. Perry was able to on summary judgment. That his medical records for most of the spring and summer of 2016 show that he was functioning well. And they report him as calm, pleasant, organized, rational, not paranoid, not showing any suicidal plans or ideations. And all of a sudden there is a rapid shift in that in August, around the time that the forcible medication treatment was first administered. But previous to that kind of rapid shift, it appears from the record that he was taking the Geodone and it was effectively managing his symptoms. And I think that, again, that's one of the fundamental errors. One of the points that the district court did not consider is the procedural complexity of opposing a summary judgment motion. Summary judgment is an evidence motion. It's not an allegations motion. It's not just what are the facts, it's how do you prove them? And Mr. Perry really struggled and was not able to effectively gather the evidence that would have let him most effectively oppose that motion. And even with the limited evidence he did have, he was not able to put it together in an effective and persuasive way. And to draw out for the court that there is legally sufficient evidence in the record that he has an allergy to Haldol, that he experienced symptoms consistent with an allergy after being administered the medication in the fall of 2017. And that when he got to Newcastle in the winter of 2017, they took the evidence, the record that the treaters at Wabash Valley disregarded and that the medical record that the district court said constituted no evidence of an allergy. And his medical providers at Newcastle said that's absolutely evidence of an allergy. We're suspending the treatment with Haldol immediately. All of that evidence. Sorry, go ahead. I want to share an impression with you. And you can push back on it or I'd invite you to. The kind of top line thematic point that you're making has a lot of appeal. Given Mr. Perry's mental illness and the gravity of the mental illness, how in the world is he capable of representing himself in a matter like this? But one of the things that has concerned me in preparing for the case is when I actually look at his filings, and everybody, there's no contest that the handwritten documents that he submitted that he wrote them, nobody's contending they were ghostwritten or anything like that. And when I look in particular at his summary judgment briefing filed on July the 5th of 2018, document number 168, it is remarkably impressive. He's not only talking about the correct legal standards, he's doing so with pinpoint citations to the actual governing precedent. He's describing his own situation, the mental illness that he suffers from, and his concern about an allergy to Haldol in clear and precise terms. And I would say well beyond that which our court tends to see in pro se submissions. And so how is that not evidence of what the district court was finding in her orders denying him counsel because she made plain reference to having reviewed the submissions in the case. And so that's what I tried to do preparing for today. And I've got to tell you, he's quite able to articulate his positions. I think I would agree with that, that the briefing, the legal argument is put together better than average for a pro se litigant. But, you know, this court has said in many of its opinions, you know, attorney argument, argument in a brief is not evidence. And that was where he ran aground at summary judgment. He did not do two things that I referenced a moment ago. Number one, there was evidence in the record that he could have used and did not. He does he cited to some of the medical records, but he didn't even attach them to his motion. Right. It wasn't until the defendants moved that that evidence even made it into the record. So he really didn't have the capability needed on summary judgment. Isn't one of them isn't his biggest factual the biggest factual difficulty in the hand that you've been dealt? Is that the medical the medical evidence does not seem to support his belief in an allergy to held all. There is good support for that belief in Haldol. And I think number one, I think the premise that the district court rested on that a self-reported allergy is no allergy. This court has rejected that idea. In the Drino case or Greeno, excuse me, Greeno versus daily where it said oftentimes self-reporting is the only medical indication of a symptom, especially in a prison where there's not exactly robust testing. And I've laid out a moment ago that he reported at the hearing evidence of his allergy. I have a hard time breathing when I take Haldol. That's at page 76 of docket entry one seventy five dash to Dr. Birch in his affidavit says difficulty breathing is a symptom of an allergy to Haldol. We agree with that. And then a few weeks later, on September 4th, 2016, while he's being injected with Haldol, he shows up reporting shortness of breath. That's in page one ninety one of docket entry one seventy five dash two. So there is credited at summary judgment as this procedural standard requires it to be. There is legally sufficient evidence of his allergy to Haldol where appointed counsel could have made a difference. As that evidence could have been much stronger with either expert testimony, if counsel could recruit an expert willing to work pro bono or with the deposition of the treating physician from Newcastle. The one who looked at those records and said, I am discontinuing Haldol effective immediately based on what I see in these medical records. So the evidence is either in the record or it could have been with the assistance of counsel. And again, Judge Scudder, I don't disagree with your reading of the lucidity of some of his filings. There are some that don't paint him in as good of a light, doc entry one fifty five, where he describes the global conspiracy to poison him. There are a few others that I think manifest that he does suffer from medical paranoia and that did at times interfere with his ability to litigate the case. But really where the rubber meets the road for him is not with filing briefs. It's marshalling evidence. And, you know, I think several cases from this court in particular, the Penwell versus Parrish case, the James versus Eli case, that the Perez versus Finoglio, that when you get to summary judgment as a pro se litigant, the stakes go up, the complexity goes up and that just becomes a lot harder to manage. So I thought if I pleases the court, I'm happy to answer their questions. If there are none at this time, I'll reserve the balance of my time for rebuttal. OK, very well, thank you. Mr. Crandall, we'll turn to you. Good morning. Good morning, your honors, and may it please the court here. Judge Magnus, since the district court level, when she reviewed Mr. Perry's motions to appoint counsel, she used her discretion to not deny each based on what she perceived to be his competence in his filings. As you referenced, your honor, his ability to litigate his case. So this court is not to ask whether she was right, but whether it was reasonable based on what she knew at that time, based on her review of the record. In order to reverse Judge Magnus' sense, and this court must find that she abused that discretion and that that abuse was prejudiced to the plaintiff, meaning there was a reasonable likelihood that counsel would have altered the outcome of this case. Where in the record from the district court can we see that the district court explicitly considered the complexity of Perry's claims or the stage of litigation? Your honor, Judge Magnus Stinson certainly does not bullet point paragraph by paragraph. But if we look at her orders, specifically, I believe it's her second order denying Mr. Perry's second motion for assistance. Judge Magnus Stinson discusses that we are at the stage of summary judgment on failure to exhaust. That is the point of litigation here. It's a docket entry. Sixty six is her entry. She discusses that the motion we're at the summary judgment motion stage, that the issues in exhaustion are not overly complex and that he has filed comprehensible filings. He's shown his ability to use the court's processes, that he's familiar with the claims surrounding exhaustion. So there is the first instance where she references the stage of the litigation, your honor. And then if we look at her next entry in which she denies plaintiffs, we'll call them his third and fourth motions. It's a it's a joint entry. It's a joint. This entry responds to both his motions. Again, she talks about his his his coherent ability to argue his understanding of the facts of the case. She does not mention the current summary judgment stage here, but I believe she does check most of the boxes that counsel was referring to as far as the state of mind, as far as his mental capabilities and those issues that should be addressed by the district court. So if we take a closer look at those, I think it's pretty clear that in his first motion to appoint counsel, Mr. Perry simply fails to meet the first prong under Pruitt. He doesn't explain what efforts he took to obtain counsel on his own. So his motion is dismissed out of hand. If we look at his second motion to appoint counsel, that's the one that's filed while the summary judgment motion on exhaustion is pending by the defendants. In that motion, Mr. Perry concedes that he's obtained his GED. He says he has no difficulty reading or writing. He also states he has no physical or mental health issues in his own motion. He says he's had no help with the case. Judge Magna Stinson reviews it under Perry under Pruitt. Excuse me. She concludes that he's made a reasonable effort to obtain counsel on his own, and she moves on to the second prong. And that's where she discusses the stage of litigation, being that we're at the summary judgment stage on exhaustion, not the merits of the case. She notes that Mr. Perry has submitted comprehensible filings, and he's submitted and he's displayed a familiarity with the factual circumstances surrounding his attempts to exhaust his administrative remedies. At this point, she doesn't close the door to further counsel down the road, but just decides that at this point, it's not warranted. And again, even if this court found that she abused her discretion, there has to be a finding of prejudice to Mr. Perry. Mr. Perry defeated defendants motion for summary judgment on exhaustion on his own. So clearly there was no prejudice at this point because he couldn't have had a better outcome than defeating defendants on motion. And as the judge, you pointed out, his responses and his filings are filled with case law citations, coherent arguments, logical arguments. If we turn to his third and fourth motions to appoint counsel, those two, he briefs his third motion, cites the relevant case law. He analyzes the elements of a motion to appoint counsel and describes why he believes they weigh in his favor. He talks about some of the challenges in the prison and the prison law library. But that's not unique to Mr. Perry being an incarcerated litigant. He further discusses how counsel should be appointed due to his lack of legal training. But at this point, he's already defeated the summary judgment motion on his own. So Judge Magnuson again analyzes this under Pruitt. She again states that he has met the first prong. He's made an effort to obtain counsel on his own. So she goes to the second. At the time of her order, Mr. Perry had already filed his own summary judgment motion. So at the time Judge Magnuson issues her order, she had the benefit of understanding his knowledge and grasp of the facts as he had presented them in his 20-page summary judgment motion just one month prior. And she states in her entry that she took a review of the record. That was in the record. She discusses that, again, his educational background. He's obtained his GED. She reiterates his statement that he does not have difficulty reading or writing English. Mr. Perry in that third motion states he has a brain injury. Doesn't really describe what or why, what's going on with it. But Judge Magnuson references that. And that's when she states that a review of the record indicates that he has been able to present his claims and arguments coherently, which speaks to his competence and his mental ability. She also notes, again, that he was able to defeat a summary judgment motion on his own. She discusses how he appears familiar with the specific legal claims and facts, which are he was forced to take psychotropic medication against his will. She doesn't simply use boilerplate language, which this court has repeatedly struck down. Instead, she crafts her entries based on each of his filings for a motion to appoint counsel. She analyzes whether he seems competent. She reviews his educational background. She discusses his familiarity with the specific claims, both legal and factual. And she discusses his abilities as a pro se litigant, which reflected comprehensible filings, even defeating a motion for summary judgment. Again, if this court were to believe that Judge Magnuson is an abuser of discretion, there still must be a finding of prejudice. It's not a test of whether an attorney would have made Mr. Perry's life easier. Of course it would. That's not the test. If it were, every pro se litigant would have an attorney, and there just aren't enough out there, and that doesn't meet the requirement here. So would there have been a reasonable likelihood that appointing counsel would have changed the outcome in this case? And the answer here is simply no. Counsel would not have changed the fact that an independent treatment committee decided it was in Mr. Perry's best interest to administer Haldol against his will based on his repeated threats of self-harm, paranoia, potential for harm to others, his refusals to eat, and his refusals to take his oral antipsychotic medications leading up to the hearing. Counsel would not have changed the fact that the treatment committee was aware that Mr. Perry had a listed allergy of Haldol, and that when they asked him about it at the hearing, he described what they believed to be more likely side effects versus an allergic reaction. Counsel would not have changed the fact that the treatment committee ordered Benadryl along with the Haldol to counteract any potential allergy or side effect from the medication. Mr. Perry also contended in his brief and his reply brief that counsel is necessary in cases of deliberate indifference where the defendant's subjective state of mind is relevant and it's difficult for a pro se inmate to figure that out without depositions, but that's not the case here. We've got the treatment committee report, which Mr. Perry had access to in his medical records. Typically in records, we may see a physician orders a medication or orders something else, but we don't know why they do it. Here we have a treatment committee report that details why they believed Mr. Perry required medication, why they believed it was in his best interest. Mr. Perry did not need counsel to figure that out. It was provided to him in the record. So overall, I want to, I want to ask you this, please, because I saw a lot of evidence of complaints of side effects, side effects, and a lot of evidence that the mental illness continued. Yet, is there anywhere in the record where someone evaluates whether the forced medication is actually helping Perry in a significant or meaningful way? Well, your honor, I think there's evidence in the record from the day I believe it's the day of the first injection where Mr. Perry reports to one of his health care providers that he's feeling better. I know that's in our underlying brief and our appellate brief. Was that on August 11th of 16? Correct, your honor. Correct. And there's, there's additional in the record that I think it kind of waxes and wanes to where he says, yeah, you know what, I think it was helping. And then at times he says, no, I don't think it was helping. So it was kind of an up and down scale, but I don't think the purpose, your honor, of the injection was to quote, cure him of his mental illness, unfortunately. I don't see it getting better. I saw August 15th, agitated, anxious, suicidal, complaining of side effects. August 18th, 26th, paranoid, complaining of side effects. August 30th, suicidal, seriously mentally ill, complaining of side effects. September 4th, paranoid, complaining of side effects. September 13th, suicidal, 21st, irritable, paranoid, anxious, suicidal, significant psychotic symptoms. December 6th, paranoid, increasing violence, 21st of December, paranoid, complained of side, on and on. I mean, I see a lot of evidence of complaints. I do not disagree with you, your honor. Mr. Perry has mental health issues that will not be cured by an injection. The injection was meant to deal with that acute issue of psychosis in mid-August 2016, when his providers felt he was really spiraling. He was on a downward trend, and they thought he was potentially suicidal. So again, the injection was not there to cure Mr. Perry. It was there to try to prevent him from harming himself or others. And as we see, he does not harm himself or others after the fact. So to a degree, yes, the injection was actually successful. The injections were successful in keeping him from actually harming himself or others. Do they prevent him from having these thoughts? No. Unfortunately, I don't think there is any medication that is going to cure him from those thoughts consistently. But the goal and the hope is to reduce the frequency of those thoughts and concerns, your honor. If we move on and talk about Mr. Perry's due process claim to the hearing itself, Mr. Perry, it's without question, it's in the record, he was informed of the hearing the day before. There is dispute as to whether he was given notice or whether he tore it up. But the fact is, he does not dispute that he was informed of the hearing the day before. As far as whether the hearing is in his medical interest, Mr. Perry has a diagnosis of paranoid personality disorder, antisocial personality disorder, and anxiety and depression. And the record establishes, and Mr. Perry concedes in the record, that he was noncompliant with his medications and he exhibited paranoia and thoughts of self-harm. Just one month prior to the committee hearing on July 6, 2016, Mr. Perry submitted a health care request in which he stated he fights suicide daily. The day before, on July 5th, again about one month before this hearing, Mr. Perry's mother called Dr. Sims at the prison and reported that her son had written a letter to her saying that he was going to kill himself if not given protective custody. His mother explained how he had been talking to people not there and had had these symptoms since he was 16 or 17 years old. In June of 2016, just two months before the involuntary medication hearing, Mr. Perry told his psychiatrist, Dr. Birch, that he does not take his voluntary medications 96% of the time. On August 10, 2016, the day before his hearing, Mr. Perry was talking to Lisa Eisberg, a mental health professional, and she noted that Mr. Perry had threatened to kill himself if left in his cell. She also noted that his anxiety, his lack of impulse control, and his psychotic symptoms were significant and worsening at that time. So this is an acute episode we're talking about here. And as for his paranoia, there's talk about, well, was it founded or unfounded? That's not really material because it was his potential to harm himself or others from that paranoia that was concerning. Therefore, Judge Magnus Stinson appropriately concluded that based on the designated evidence, the decision to involuntary medicate Mr. Perry was in his best interest. As far as the impartial review panel, it's confirmed that the panel was not made up of anyone who treated Mr. Perry as an actual voting member. Lisa Eisberg was present at the hearing, but she was not one of the voting members. It was comprised of Dr. Sims, Dr. Chavez, Dr. Ripito, and therefore the committee was impartial. And to quickly get a minute here to talk about his alleged allergy to Haldol, I think the real issue is not whether he had an allergic reaction versus a side effect. The issue is whether the decision initially to administer it, based on the knowledge that he is listed as an allergy, was deliberately indifferent. And the answer to that question is no, because the defendants didn't blindly give Mr. Perry Haldol knowing that he had listed as a possible allergy. Instead, they were aware it was listed as an allergy. They spoke to Mr. Perry about it at the hearing. They documented Mr. Perry's statements about why he believed he was allergic to it, about his muscles locking up, shortness of breath. They made a reasoned medical determination that what he was describing was most likely side effects versus a true allergy, as a true allergy to Haldol is very rare. Also, in an abundance of caution, they prescribed Benadryl along with the Haldol to counteract any potential allergic reaction. So it's these steps leading up to the decision that need to be considered when deciding whether those actions were deliberately indifferent, not Mr. Perry's subsequent reaction to the medication. I think overall, to conclude, Your Honors, the defendants in this case were proactive in their care of Mr. Perry. Instead of sitting idly by and waiting for himself to harm himself or others, they took action that was reasonable and appropriate. And I think that's borne out by the fact that he does not harm himself or hurt others. And I believe Jane Magnus-Denson applied the correct standards and that her decisions should be affirmed. Thank you very much. Mr. Crandall, thanks to you. Mr. Falcone, you have four minutes. Thank you, Your Honor. I had four points to make briefly.  The first is that in the James v. Eli case, I think says it best that it's an abusive discretion for the district court to fail to consider all the relevant factors. The relevant factors here are the ones that Mr. Perry raised in his motions to appoint counsel and those that this court has identified in its case law as requiring consideration by the district court. And James v. Eli is really factually almost on all fours with this case. It was at the summary judgment stage. The inmate had been transferred to a new facility. The claims involved proof of state of mind. There were complicated medical issues. And on all of those points, the district court had not given adequate consideration. And this court reversed the denial of the motion to request an appointment of counsel. I think the procedural issues that we discussed in my opening argument, I'd like to point the court to the Santiago case, which says it's an abusive discretion for the district court not to come to grips with the difference between facts and evidence. Mr. Perry's ability to understand the facts of his claim does not mean that he has the capacity to conduct sufficient discovery. And it's an abusive discretion for a district court to conflate those two inquiries. When he was transferred, did his condition change or did all these same things continue? The evidence in the record, so he's been in Newcastle for a while now is my understanding, and there's only evidence on some of that time. He has done better at Newcastle. It's a medical facility to treat people with serious medical issues. So they've done, I think, a pretty good job managing his system. Is that a permanent transfer then into that medical facility? So that's not in the record. I'm 90 percent sure that it's not that the idea is that they're folks get transferred there to be stabilized and then will be transferred back out to a kind of all purpose sort of general facility. That's my best understanding, but I don't think that's in the record. Thank you. The other point I wanted to just draw the court's attention to quickly is, you know, the appellee is not here today, Mr. Mitchiff. His whole argument is that Mr. Perry proved to fail to prove his personal involvement. And I think we don't dispute that, that on this record, that proof is not there. Mr. Perry pointed to that factor specifically in his third motion to appoint counsel. He said there's a large number of defendants here that raises questions of sufficient personal involvement. That's paragraph six, page 39 of the required supplemental appendix. He identified the issue that he ended up being unable to prove against one of the defendants, asked the court to appoint counsel to help him on that issue. The court did not address that issue. That's the kind of oversight that this court has held is an abuse of discretion. The second point I wanted to respond to briefly is the resolution of the first motion for summary judgment on exhaustion. I think that really proves the point that Mr. Perry defeated that motion literally by using a single document. That was the evidence that was sufficient to defeat the exhaustion because he put in a grievance form that said, you've done enough, you can take your appeal. And this court says that the inquiry is not so formulaic as just summary judgment or not. We looked at the complexities involved in the underlying issues. I think the third point on prejudice that I'd like to make, the basic point is that Mr. Perry needed additional discovery. The appellees are kind of putting him in a double bind where, on the one hand, they say, well, you had everything you needed. You had the documents. On the other hand, the argument they made to the district court, which she accepted, was disregard what's in the documents. He made up the allergy. It's not real. It's no evidence of an allergy, and the court credited him. So they're saying he had all the discovery he needed, but when he submitted it, they said it was no evidence. So he needed an opportunity to have a lawyer who could go retain a medical expert to rebut the three Rule 702 affidavits that they submitted on summary judgment. He should have been able to depose the defendants. He needed to account the lawyer who could depose the folks who were treating him at Newcastle. And as I mentioned in the opening argument, appointed counsel could have made better use of the evidence that was in the record. I see that I'm out of time. The only last point I want to make very briefly, if I could, on the underlying claims that Mr. Crandall talked about why the current record supports summary judgment. We've briefed why we don't think that's true, but we ask that the court vacate and remand or reverse and remand as appropriate, with instructions that appointed counsel be given a chance to reopen discovery, pursue additional evidence to support those claims. We appreciate the court's time this morning. Thank you. Okay, very well. Mr. Crandall, thanks to you. Mr. Falconer, same to you. I know that you took this case on appointment. You have the special thanks of the court to you and your firm, and you've done a fine job for your client. So with that, the case is taken under advisement.